We are now going to hear the case of Snowbridge Advisors v. Silver Square 22-1054. We're going to start with Mr. Barton. Thank you, Your Honor. Good morning. May it please the Court, I'm Roger Barton. I'm the managing partner of Barton LLP. We are the attorneys for Snowbridge Securities and Snowbridge Advisors, who are the plaintiff appellants across the Palis. I'm joined today by my colleague Randy Rasey, as well as three of our summer interns who aspire to join our medical profession. This is a simple breach of contract case brought by Snowbridge Advisors and Snowbridge Securities to recover approximately 2.5 million euros owed by ESO Partners and its successor, Soho Square, pursuant to the terms of an agreement under which Snowbridge Securities, as assignee of DCS Advisory, acted as exclusive financial advisor and North American placement agent in connection with proposed private placement of funds managed by ESO and later by Soho Square. Snowbridge Securities was entitled to a monthly work fee of 30,000 euros and a minimum placement fee of 3 million euros, less what was already paid in the monthly fees paid at the first closing, regardless of whether or not Snowbridge itself raised any funds. Snowbridge has tried to collect this fee since December of 2020. No time prior to this lawsuit did ESO or its successor, Soho Square... Counsel, can I interrupt and have you describe for me the relationship between Snowbridge and DSC, is that what it's called? DCS. I may have gotten that wrong. What was the relationship between them? Yes. When this agreement was first signed, Snowbridge Advisors was not a registered broker-dealer. So DCS was the only broker-dealer in this deal? Correct. DCS was brought in as the broker-dealer, which, as I'm sure the court knows, was required to act in connection with the placement of securities. Snowbridge Advisors was not registered. It was necessary at that time. Correct. But at that point, the client relationship, if I'm understanding it, was Snowbridge Advisors. DCS didn't independently have the client relationship until you brought them in as the broker-dealer? Exactly right. In the placement agent, this is called a placement agreement, Snowbridge is what they call a placement agent, because they're really a placement agent or a third-party marketer. Securities needed to be sold through a registered broker-dealer, as you just said. Snowbridge Advisors at that time did not, was not itself, have its own broker-dealer, so they had a relationship with DCS in the industry called the Hotelling Arrangement, where DCS would allow the registered representatives of Snowbridge to act under their umbrella. They were the ones doing the work, they were the ones engaging with the client. So what did Snowbridge contribute to the deal? They just brought people together? Snowbridge were the working entity of the deal. Snowbridge had registered representatives, individuals, who were the ones that actually provided the services and worked with ASO to get them investor-ready, organized the investor meetings. So who was the fee due? The fee could only be accepted by a registered broker-dealer, and that's why DCS was needed. But is it correct to say that the governing document for these relationships was the agreement between ASO Capital Partners and DCS, as to which Snowbridge signed, but was kind of ancillary in terms of its mention. It has the right to a sign in it, but it has a couple mentions. The primary rights and obligations are between DCS and ASO Capital Partners. That's correct. Is that right? And there was no other agreement that reflected this relationship? There is no other agreement, but this agreement is very key, and Snowbridge Advisors was not quite ancillary. In fact, they were front and center. Well, the main obligations, rights and obligations, stated in the agreement are between DCS. It's on DCS letterhead, of course, and ASO Capital. Correct, with one major exception, which was it was contemplated when this agreement was signed that Snowbridge would either form its own broker-dealer or purchase a broker-dealer and therefore be able to become a broker-dealer. Did it ever form its own broker-dealer, Snowbridge? I'm sorry? Did it ever form its own broker-dealer? Yes, it did, and that's when Snowbridge gave notice to ASO that the DCS fees would now be assigned to Snowbridge Securities. Did DCS agree, or did they have to? DCS agreed in the initial agreement that Your Honor was just referring to that at some point along the way, their rights could be assigned over to a broker-dealer, either formed by Snowbridge or designated by Snowbridge. So DCS didn't object to the transfer? No, they did not object. It was always contemplated that that was what would happen, and that's why the assignment... When you say it was always contemplated, of course, the governing document has language that reflects what it reflects. The parties may have contemplated something else, but in interpreting the parties' rights and obligations, we look to the language of the agreement. I agree. And if you look at the language of the agreement, the assignment provision is very carefully worded. There's an assignment provision that allows Snowbridge... Is that right? And your position is that that meant everyone's rights and obligations, not just its own? It meant DCS's rights because it refers, as you go on to the next phrase there, to, one, a fully licensed broker-dealer affiliated with Snowbridge and Snowbridge's discretion. But typically in the law, you have the right to assign your own rights and obligations, not the rights of other parties. For example, it had assigned the rights of ESO Capital as well? No, it couldn't. And why is that? Because those rights were not rights that would be assigned to a broker-dealer. But it doesn't say that, does it? It just says the rights and obligations. Correct. But the only logical reading of that, Your Honor, is that Snowbridge contemplated, as we had said, to form its own broker-dealer and be affiliated with them. But why is it logical to presume that, contrary to standard law, that it would be able to assign rights and obligations that weren't its own? Because of exactly what this language... This language is the assignment. The execution of it came later. But this language allows Snowbridge, in its own discretion, without asking for permission, to assign the rights to a broker-dealer, DCS. DCS, as a broker-dealer, received the fees. Why couldn't it have assigned its own rights and not DCS's rights? It could, but to what point? The way the economics of the contract work, DCS is the only one allowed to accept fees for the placement of these securities, and then it pays money to Snowbridge. Snowbridge wanted to become the only broker-dealer in the United States. So if we read the contract the way that your counterpart would like us to read it, there's this weird, gratuitous reference to Snowbridge assigning its rights and obligations, but it has no rights and obligations. It would be a... I would tend to agree with that in almost whole. Snowbridge Advisors, of course, is on here as the party that needs to execute that, so that's the right that it has. Right. That's the right that it has, but there's nothing else. In other words, absent that paragraph, is there anything else about this contract that leads us to think it makes sense for Snowbridge Advisors to even be a party to the contract? Correct. That's correct. Well, it makes certain representations and warranties, doesn't it? Well, it does. Which would be actionable if they were false. That's right. But the main import of this contract is to place securities and earn a fee. I mean, that's boiled down to the minimum. Snowbridge was not entitled to get a fee unless it was a registered broker-dealer. DCS is the only one entitled to get a fee. So, your Honor is right. That's the point for having Snowbridge having the right to assign DCS's rights, the rights, to its own broker-dealer. Since the rights, you say, encompasses its own rights as well as DCS's rights, why couldn't it have assigned also ESO capital rights? You're saying that it wouldn't have made economic sense or didn't kind of track... It makes no logical sense because the rights of Snowbridge and its side of the ledger, if you will, in placing securities on behalf of ESO, there would be no reason for Snowbridge to cross over to ESO. But my problem is that because the language, you're saying it's not just its own rights and that we should just look and try to understand the economics of the deal to read against the common law principle that you would generally have the right to assign your own rights, that it's kind of logical, it's only logical that it would be DCS's rights, and I agree with the common law. You can't assign someone else's rights. But the point we are taking, I think, is clear. This contract, when signed, already provided the assignment. We just didn't know who it was going to be assigned to, but we knew it would either be a broker-dealer affiliated with Snowbridge or someone else that Snowbridge would designate. I'm sorry, I didn't quite understand. You said this contract, when signed, already provided the assignment? That's correct. I think the assignment provision in the engagement letter, the way that this is written that Snowbridge in its absolute right can make the assignment, that then and there is the assignment. The execution of it, the party to be designated comes later. Is that the assignment or is it the agreement by DCS to consent to the assignment? I guess you could say it's their consent, their understanding that their rights would be assigned. It's the execution of that assignment later. And if you look, distinguish this language from the other assignment language. The other assignment language requires consent of the party's prior written consent. There's no prior written consent here. It also says shall have the right to. We can't ask their position on this, but I have a question about the district court's opinion who found that the agreement unambiguously barred Snowbridge from unilaterally assigning DCS advisory's obligations under the agreement. Tell me where the district court got that wrong. I don't think, for the reason we're debating it right now, I don't think it's unambiguous. From our standpoint, it's clear that the assignment provision was, the assignment was given in this agreement. But even if it's unclear, then it's vague. And if it's vague, that does not support a motion to dismiss. Because that would then take us to extrinsic evidence. We might look at the fact that DCS didn't object when the payments started going for several months to Snowbridge. Correct. Which is exactly right, Your Honor. We need to look at the conduct of the parties following the assignment. ESO paid Snowbridge. ESO never objected. And I take it DCS didn't seek to intervene in this action in saying we're the real party in interest here. Correct. Everybody understood this the way that we're presenting it to the court. Unfortunately, the court below didn't agree with that. But even if, and I don't concede that it's vague or ambiguous, but even if it was, that doesn't support a motion to dismiss. So the district court read the agreement incorrectly. It's a tortured reading. I don't see any logical way to read it the way the district court read it. I think we're going to get to hear from you again. Thank you. In rebuttal. So we'll hear from, who's going first here? It's Mark Seidman for ESO Capital. Mr. Seidman. Good morning. Good morning. May it please the court. Mark Seidman on behalf of Defendant Appley, ESO Capital Partners, UK, LLP. I want to start, Judge Robinson, by addressing your question about assignable rights that Snowbridge had under the contract, because there were assignable rights. First, in the introductory paragraph of the agreement, Snowbridge has given the right at DCS's discretion to perform services under the contract. So that is a right. In addition, under Section 6 of the agreement, Snowbridge has a broad right to indemnification under the indemnification provision. Under Section 8 of the agreement, Snowbridge had an express right to prevailing party attorney fees in any litigation, a provision that they actually tried to assert in the district court below. So there were clearly assignable rights, as well as obligations, which I could outline, that Snowbridge had under the agreement. So can I ask, there's a couple of questions that have sort of come to my mind during the argument. One is, there is this common law principle that you can't assign someone else's rights, or at least without their consent. I think you can see it on page 20 of your brief, if I'm remembering right, that a party can certainly agree to allow their rights and obligations to be assigned by a third party. And the issue in this case is whether that's happened. So am I right that this common law principle that you can't assign somebody else's rights or obligations without their consent is sort of a, it's a circular argument. It doesn't help us determine what's your client did agree, or not your client, I'm sorry, DCS did agree to allow its rights to be assigned. It's possible that it didn't, and we're looking at the language to try to figure that out. Well, they had an opportunity, certainly, to plead in their complaint that DCS agreed in a separate document or to bring that evidence before judgment. Well, they don't need a separate document. In other words, if we conclude either that the document clearly contemplates reading which your counterpart is advocating, or that it's ambiguous, and a court ultimately concludes that it has the meaning that they're advocating, then the fact that there's this common law principle is not an obstacle to enforcing that contract, because they've agreed. You're not arguing that that common law principle overrides the agreement. Right. I think our argument is that section 13, the assignment provision, is clear on its face, that the word assign has a clear definition. We've cited nine different cases that say what it means. Judge Rakoff found it, and they don't necessarily disagree. They seem to be saying that they had an option in section 13, an option to assign the rights, and it doesn't make sense. Judge Robinson, let me suggest it doesn't make sense, because it would lead to absurd results, and I'll give you an example. Let's assume, under the contract, they didn't exercise, they didn't serve this supposed right, and instead served that notice in December of 2020. That means during the duration of the contract, DCS performed, it had a right to payment. And it got a payment. And what the allegation is that at some point my client stopped paying, and that owes $2 million plus under the contract. And so what Snowbridge's position is, is that they could walk in in December 2020 when all the performances are over, serve this assignment notice, and say, we now have all the rights under the obligation, and you don't pay DCS, you pay us the $2 million. That's an absurd result that at the end of the transaction, they could come in, serve a piece of paper, and all of a sudden they're the rightful owner of the right to payment. But that's the logical consequence of what they're arguing. So I'm curious, am I I did say, okay, we're electing Snowbridge Securities as our new broker-dealer for the purpose of this arrangement and the placement that we're doing. Am I right that at that point your client started paying Snowbridge Securities, and DCS didn't object, and there was a period of time when everybody understood that that assignment had happened, it wasn't objected to, and it's only this litigation that's brought out this new position that that's not actually what the contract meant? Well, so I would, here's what I would contest about that. First, it's an attempt by Snowbridge to use parole evidence to create an ambition, which we can't do. But if we get past that, the issue is whether my client understood that this notice that they gave was an assignment. My client was under the impression that Snowbridge had a valid assignment. In other words, that DCS had given that piece of paper that said, we hereby assign our claim. That didn't happen, and after two months, the payment stopped. But I don't think, so that's part of it. So just based on Snowbridge Securities' say-so, your client assumed that DCS had conveyed its rights without checking with DCS? Again, we don't have facts in the record. I don't have that information for your parole evidence. But we're also in the middle of a transaction where Snowbridge was doing some of the work under section, under that right to work in the introductory paragraph. My client couldn't just walk away from the deal at the crucial time. It had to move forward. But after two months, it stopped, and the deal stopped. And then in terms of objecting from a litigation perspective, my role in challenging the assignment, one of them, is to avoid inconsistent judgments. They left DCS out of the lawsuit. And so before we can move forward, I need to see who is the valid owner of this claim. And so there we go back, we go back to the contract. And I'd refer the panel, if I could, to a decision Judge Pooler wrote and cited by Snowbridge in their papers. And this is the, it was last year, Judge Pooler, the J.N. Contemporary Art v. Philip Auctioneer's case. You may remember it was Force Majeure related to COVID and art auctions. And one of the things that you wrote about in that decision, if the parties meant to include, there was a trade, if the parties meant to include a trade, they could have drafted their agreement to say so. And that was a strong principle in that decision. And it's the same situation here. If Snowbridge meant to have this role that Mr. Barton so eloquently talked about, the telling and the rest, the agreement could have given a whiff, a hint of it. But that's not the case. Well, I mean, I guess that's what we're debating, right, is whether Section 13 states it plainly, is ambiguous as to whether it states it or doesn't, or clearly doesn't state it. I mean, that's what we have to look at the language. But we, on your reading, we have to make sense of this whole notion. One of the things I'm struggling with is Snowbridge has told us a story that makes total sense of the language of the agreement as it's there. I'm waiting for a story from you that makes sense of this whole notion that Snowbridge can assign the rights and obligations to another broker dealer if that's not understood as a substitution for the existing broker. So Snowbridge told a story about hoteling. And I agree. But that hoteling, there's nothing in the agreement. So they're telling a story which is all parole evidence. If you look in their brief, they talk repeatedly about the purpose of the contract. Never once is there a cite to any language within the four corners of the document. Right. I'm just trying to understand. I'm And so tell me a parole evidence story that makes sense of the contract as it's written. It doesn't have this assignment and particularly an assignment authorizing Snowbridge to without consent assign rights and obligations limited to a fully licensed broker dealer affiliated with Snowbridge or another broker dealer with the written consent of the company not to be unreasonably. What does that even mean other than in the story that we've heard? I think the story I would tell you is we're looking at a contract where we have an assignment provision towards the end, which is a basic assignment clause that gives a party the right to assign its own clause. Would it have been better for me if my client on day one had said, no, let's stop. This isn't what's supposed to happen. Perhaps. Right. Then I would have a story to tell you. But it doesn't change the fact that that's all parole evidence. And I think Judge Robinson, if I might, if we had been here and Snowbridge was saying we assigned our own rights to Snowbridge securities under the contract, I think no one would be challenging that and say, of course you did, because that's the clear unambiguous meaning of the assignment provision in Section 13. But wouldn't that be ambiguous? I mean, it is ambiguous, right? The use of the term the has generated a lot of questions here. If that had said its rights, and this is sort of going to be, if that's what they meant, they would have said it. If they had meant that they could assign its rights, that would have been a very easy thing to draft and it would have been a one word change. It could have been, but the problem with that from Snowbridge's perspective, the problem with that argument is it doesn't change the well understood definition of the meaning assigned, right? And so there is law certainly in New York in terms of the canons of contract construction, and this was the opening point I was going to make, that when interpreting a contract, words should be given the meaning ordinarily ascribed to them. And that's legion, it's black letter law in contract construction. So assign, we've all agreed, can only mean one thing, assign its rights. So the word assign necessarily means assign its own rights. Well, but that's assuming that the word assignment was well chosen in the article, the was not. It's possible that the word the was artfully chosen and the term assignment was more clunky. I mean, doesn't that make it ambiguous? One way or the other we're going to have to take a word and we're going to have to read it in some way other than its sort of plain language. Isn't that sort of the definition of ambiguous? I don't think so. And for this reason, one, again, we go back to assign having a clear definite meaning. Two, the interpretation offered by Snowbridge would lead to absurd results. It's like Judge Cardi mentioned earlier, why wouldn't they under the interpretation have the right to assign ESO's interest? Why wouldn't they have the right to assign the fund's interest? That's the logical extension of their argument. And again, it's the canons of contract construction. We avoid interpretations that would lead to absurd results. I don't have any further. I appreciate your argument. Thank you very much. I think Mr. New is next. Oh, I'm sorry, Mr. New. You're right. Thank you. Not trying to cut you out of the conversation. I apologize. That's all right, Your Honor. I'm happy to answer any questions the court has. Let me just say good morning. May it please the court. Well, you have the cross appeal, don't you? Yes, Your Honor, I do. And you agree that if we affirm the judge below, your cross appeal is moot. Yes, that's correct, Your Honor. So you're proceeding on the assumption that we may not affirm the district court. Proceed and tell us about successful liability. Thank you, Your Honor. And while I'm proceeding on the assumption that you may not, I believe that you should affirm the district court as well on the ruling as to whether or not Snowbridge Securities has standing. In the event, however, that you disagree for whatever reason, we think that you should nevertheless reverse the district court with regard to the issue as to whether or not Snowbridge Securities established successor liability against SoHo Square. The district court had a very perfunctory analysis of the choice of law issue. In fact, it really didn't entertain a choice of law analysis. What it simply said was there's a contract, the contract says New York law applies, and therefore where am I going to apply New York law? But that's not what the case law says. It's not what logic would dictate. Because the question before the court in the first instance was whether or not SoHo Square, which is, everybody agrees, not a party to the original agreement, whether they could be held liable on a successor liability theory for the alleged breach by ESO partners. And that question is a question that is collateral to the contract, as then Judge Alito noted in the Berg decision, as this court similarly opined in the Blue Whale and Cow decisions, where the question there was slightly different. It was whether or not a party could be found to be an alter ego or they could pierce the corporate veil in a breach of contract case. And this court said we don't look at the contract for that determination. The successor liability determination is based upon the interest analysis under New York law. Would you recommend, if we agree with you on that, and if we get to this issue, would your recommendation be that we then remand to the district court to do a New York interest analysis? Or do you think that we can go further and conduct that ourselves and make the determination? Your Honor, I believe that this court can make that determination. It is a question of law. The record is complete based on the allegations in the complaint alone, as well as the applicable law. We believe that it's clear that English law should apply. Is there a conflict? Can I interrupt for a second? Is there a conflict between English and New York law on successorship? Yes, Your Honor. We established in the district court, and it really wasn't contested at all by the plaintiffs, that under English law there would be no successor liability at all. There are no exceptions to the general rule that a company that acquires the assets of another company but doesn't merge with it is not liable as a successor unless they expressly assume that or there's a novation of the contract. There's been no dispute on that either below or here as far as I'm aware. So that would be a dispositive issue. If this court were to agree with us that English law should apply, then under English law there is no successor liability and Soho Square should simply be dismissed from the case. It's interesting on this question of whether English law applies, and you're relying, if I'm remembering correctly, on this sort of notion that successor liability falls into that category where the place of incorporation has the greater interest. And there are New York federal district court decisions that seem to fairly uniformly support that. The New York state trial court decisions uniformly reject that and take a much more flexible view. And I'm not seeing anything from the New York Court of Appeals on this subject. Am I wrong that the New York Court of Appeals hasn't addressed the question of whether the successor liability question falls within the internal affairs doctrine? I don't believe that they have. No, Your Honor. I don't believe there is a court of appeals decision on the question of whether successor liability falls within the internal affairs doctrine. But I believe actually that the contrary application of New York choice of law rules are those two New York Supreme Court cases which are distinguishable. They have not cited to any case in the first instance where a court has applied the language and choice of law in a contract to a non-party to determine the choice of law issue. They haven't contested that. And then with regard to the other cases, there are numerous cases in the district court here. Again, by analogy, Blue Whale and Cald, this court found as well where the interest analysis applies and the place of incorporation and where it's primarily operating is controlling. And two of the district court cases, for example, that I think are particularly helpful here are the Planet Payment, Inc. case and the Soviet Pan Am case where the district courts said that based upon the company's place of incorporation, based upon its location, that the choice of law, the interest analysis of New York law would point to the state of incorporation. But I read the New York Supreme Court cases as saying the opposite, right? Saying that successor liability really is a question that relates to the interest of third parties vis-a-vis this entity, not internal affairs of the entity. And for that reason, while place of incorporation and primary place of business may be factors in the interest analysis, there's no presumption that it would go straight to place of incorporation or primary place of business. Why isn't that right? Well, Your Honor, I think that it is right to say that it is not a hard and fast rule in those cases that place of incorporation controls. But even in those two cases, and it's two cases again versus a plethora of cases that we cited on the other side, even in those two cases what the court said was the only connection between the company and the place of incorporation is the fact that they were incorporated there. There are no other factors. There are no other connections. So if you did an interest analysis, which you would have to do in those cases that did an interest analysis, the interest of New York, here if you look at the issue before the court, it's one company that is incorporated, organized, and located in England, the successor of another company that was organized and is located in England. And under that analysis, whether you want to call it internal affairs or just straight up New York State interest analysis, the interests of England would clearly be where not only is not present in New York, but there's no indication in the record that they have any contact with New York sufficient to establish jurisdiction. And so this is not the case where there's some sort of technical reason why English law applies. These are English companies, and the question of whether one company in England, organized under the laws of England, should be held liable for the conduct of a third party is something in which English law should prevail. England has a bigger interest in that because as one of the cases says, and then I'll wrap up, as one of the cases says very clearly, the question of whether or not a company should be held liable as a successor is really a question of public law, not a question of private law, because it's not something that's determined by the contract. And when a company is organized in a particular jurisdiction, that jurisdiction has primacy. Thank you. Appreciate it. Now, Mr. Cardin. Sorry about that. Thank you. That is confusing. I just want to circle back on the question that was asked by the court and pointed out by Mr. Seidman, the potential for an absurd result if you construe the language of the assignment. The language of the assignment references, as we've said before, that Snowbridge could assign its rights to another broker-dealer. That in and of itself indicates it's not assigning ESO's rights, because ESO is not a broker-dealer. You just used the word assign its rights. Assign the rights. Sorry. The assignment, the way the mechanics of the assignment was to work, expanded Snowbridge's authority by giving it the right to assign to another broker-dealer. It would not, ESO didn't have any broker-dealer functions, so it wouldn't assign ESO's rights. What's troubling to me is that you're expanding on the actual language of the agreement. All of these things could have been written out and could have been said if that's what was intended. But that isn't the language that the parties all agreed to. Well, there are three different elements of the assignment. There's what Snowbridge was allowed to assign in the phrase we've been talking to, the rights to a broker-dealer of its own affiliation. Then there is what it could assign to... It doesn't say the rights of a broker-dealer, does it? It just says the rights and obligations under this agreement. Correct. But tying it back to broker-dealer, it has to be DCS's rights. If it's going to be another broker-dealer, it needs to get permission. And then the other parties, ESO, the fund, DCS, cannot assign without prior written consent. So there's a waterfall, if you will, of what's required, and it's understood by virtue of our reading, and I think logic, that the assignment is already made in this agreement. That's a point that I'd like to just circle back on. Getting back to Soho Square and as a successor, I just want to alert the Court. There's one of us cited, and I apologize for that, but it's Judge Batt's case in Ray Kinggate Management Litigation, 2016, Westlaw 533-9538, and affirmed by the Second Circuit, 746, Federal Appendix 40, in 2018, where she says, quote, The Second Circuit has made clear that the application of the Internal Affairs Doctrine is not automatic. Instead, New York courts may take a more flexible approach, applying the interest analysis, which applies the law of the jurisdiction with the most significant interest in or relationship to the dispute. Here, understood that the ESO and Soho are U.K. companies. However, this entire transaction was negotiated in New York. The contract is governed by New York law. The meetings took place in New York. Our clients were the exclusive placement agent for North America. But is the question of successor liability broader than this particular contract, or is successor liability evaluated with respect to each particular claim against a predecessor company? I think it's more claim-related than it is otherwise, because that, for the same reason you don't look at the facts that were made in connection with this transaction and the parties involved. You could have a universe where Soho is considered a successor for the purposes of this transaction, but for the purposes of some other transaction, it's not? If we're looking at the interest analysis under these facts, yes. I don't think it binds Soho, necessarily, for their transactions in England. And do you, I haven't heard you challenge that English law would come out different on the question of, you're not fighting? We're not fighting that, no. If there are no further questions, thank you very much. Thank you. Appreciate it, everybody. Thank you.